IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| HILO PRODUCTS, INC., | ) | Civil NO. 22-00069 SOM-WRP |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING TARGET |
| | ) | CORPORATION'S MOTION TO |
| | ) | TRANSFER VENUE PURSUANT TO 28 |
| | ) | U.S.C. § 1404(A) |
| vs. | ) | |
| | ) | |
| TARGET CORPORATION; JOHN DOES | ) | |
| 1-20; JANE DOES 1-20; DOE | ) | |
| PARTNERSHIPS 1-20; DOE | ) | |
| CORPORATIONS 1-10; DOE | ) | |
| ENTITIES 1-20; AND DOE | ) | |
| GOVERNMENTAL ENTITIES 1-20 | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT TARGET CORPORATION'S
MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(A)**

I.        INTRODUCTION.

        Plaintiff Hilo Products, Inc., is a nearly century-old produce company on the Big Island of Hawaii.  It began as a family operation that for years sold fruits and vegetables based on trust and handshakes.  While it has grown into a business that involves transactions for millions of dollars, it has maintained a business model based on trust.  Its clients place orders, which Hilo Products fills and delivers along with invoices.  That invoice is then typically paid.  Except with its government clients, Hilo Products followed this uncomplicated business model, even with its two biggest clients, Safeway and KTA Super Stores.

In 2009, Hilo Products began selling produce to Defendant Target Corporation.  This action reflects Hilo Products' struggle with that relationship.  Hilo Products sold millions of dollars of produce to Target while under the impression that its relationship with Target mirrored the relationships it had with its other nongovernmental clients.  But Hilo Products was actually operating under a written contract with unfamiliar provisions.

In 2009 and again in 2011, Marlene Sanoria, a Hilo Products employee in its Accounts Receivable Department, signed Target's Partners Online Agreement, thinking it was just an authorization to access Target's online vendor website, called "Partners Online," through which Hilo Products could get paid. Neither she nor anyone else at Hilo Products actually read all of the online terms or thought Hilo Products was governed by any special provision.  It came as a surprise to Hilo Products to learn that the 2009 and 2011 Partners Online agreements concerned more than online payments.  Instead, the Partners Online agreements governed the parties' entire relationship.

After Hilo Products had sold produce to Target for several years, a dispute arose.  In this lawsuit, Hilo Products alleges that Target has failed to pay or has underpaid for some of that produce.

Target moves to transfer this action to the District of Minnesota based on a forum selection clause incorporated into the 2011 Partners Online Agreement signed by Marlene Sanoria on behalf of Hilo Products.  This court originally addressed that motion in an order dated May 6, 2022, which, among other things, allowed discovery and provided for an evidentiary hearing to develop the facts underlying the motion.  *See* ECF No. 39.  This court then conducted an evidentiary hearing over a two-day period.

Hilo Products does not argue that it should be excused from complying with the 2011 contract (including its venue provision) because it failed to read it.  Instead, it contends that it is not bound by the forum selection clause because Sanoria lacked the authority to sign the contract on Hilo Products' behalf.  Target argues that Sanoria had express actual authority, implied actual authority, and/or apparent authority to sign the contract.  Alternatively, Target argues that Hilo products ratified the signing of the contract.

Because Sanoria had apparent authority to sign the 2011 contract on behalf of Hilo Products, Hilo Products is bound by its terms, including its dispute venue provision.  Accordingly, the court grants Target's motion to transfer venue to the United States District Court for the District of Minnesota.

II.        **FINDINGS OF FACT.**

This court held an evidentiary hearing on December 13 and 14, 2022. When the court refers to a person's testimony in this order, it is referring to the testimony given on those days, unless otherwise indicated. Based on the evidence received at the evidentiary hearing, as well as the evidence submitted before the hearing, the court makes the following findings of fact by a preponderance of the evidence. Of course, if any finding of fact is more properly considered a conclusion of law, it shall be so construed, and vice versa.

As an initial matter, the court notes that all of the witnesses at the evidentiary hearing testified credibly. At times, some of Hilo Products' officers and employees were confused or were asked to testify with respect to matters outside of what they did at Hilo Products. This court viewed such confusion as reflecting a lack of sophistication, rather than an intent to mislead anyone.

### A.    Hilo Products is a Family-Owned Produce Business.

1.    Hilo Products is a family-owned business. Depo. of Susan Matsuda, ECF No. 79-11, PageID # 1649; Depo. of Craig Suzuki, ECF No. 78-2, PageID # 974; Depo. of Royden Suzuki, ECF No. 78-3, PageID # 1047; Depo. of Brandon Bartolome, ECF No. 78-5, PageID # 1162; Depo. of Marlene Sanoria, ECF No. 7806, PageID # 1292. It is a wholesale produce company, meaning it

4

receives produce from growers and distributes the produce to various markets, hotels, and schools. Depo. of Craig Suzuki, ECF No. 78-2, PageID # 973.

2. Hilo Products officers work hard. For example, Brandon Bartolome, its president, testified that he gets to work around 2:00 a.m. and works until 4:00 to 6:00 p.m. *See* Test. of Brandon Bartolome, ECF No. 107-2, PageID # 2843. Bartolome's work is not limited to office duties. Instead, he spends most of his day outside the office, driving forklifts, talking to customers and workers, and making deliveries. *See* Test. of Susan Matsuda, ECF No. 107-3, PageID # 2923. All of Hilo Products' officers similarly pitch in and do whatever is necessary, whether it is packing produce, acting as salespersons, or driving forklifts. *See* Matsuda Test., ECF No. 107-3, PageID # 2928. There is no task that the owners or officers deem beneath them.

3. Hilo Products was started by Henry Suzuki in the 1930s, running on an "honor system," with produce delivered one week and payment received the next. *See* Bartolome Test., ECF No. 107-2, PageID #s 2844-45. The business is still run on trust. *See* Royden Suzuki Test., ECF No. 107-3, PageID #s 2965-66. Until last year, Hilo Products used handwritten invoices. *See* Bartolome Test., ECF No. 107-2, PageID # 2852.

4. Of Hilo Products' 200 to 300 customers, only

its government clients and Target had formal written contracts
with Hilo Products. *See* Bartolome Test., ECF No. 107-2, PageID
#s 2852-53. For example, Hilo Products has no written contract
with its biggest clients, Safeway and KTA Super Stores, each of
which has purchased more than ten million dollars of produce over
the years. *See* Bartolome Test., ECF No. 107-2, PageID #s 2853,
2855. Instead, those clients simply place orders, which get
delivered along with invoices that they later pay. *See* Bartolome
Test., ECF No. 107-2, PageID # 2853.

     5.   Hilo Products' officers and managers tend not
to read documents. They tend to follow the oral directions they
get from Henry Suzuki's daughter, Susan Matsuda, signing
documents without reading them if she asks them to sign. *See*
Testimony of Marlene Sanoria, ECF No. 707-2, PageID # 2733
(testifying that she probably did not read the Target contract
because she does not usually read agreements) and # 2754
(testifying that she probably did not read things when logging
into Hilo Products' account with Target); Bartolome Test., ECF
No. 107-2, PageID #s 2795 and 2799 (testifying that he would not
read corporate minutes before signing them, instead signing them
because he trusted Susan Matsuda and she told him to do so) and
# 2812 (testifying that, although he did not understand
everything in his declaration, he had signed it because he
trusted his attorney, who prepared it after speaking with him);

Testimony of Craig Suzuki, ECF No. 107-3, PageID # 2889 (testifying that, if he signs agreements with Hilo Products customers, he does not really read the agreements); Matsuda Test., ECF No. 107-3, PageID # 2992 (testifying that she is the only family member willing to read and review contracts); Testimony of Irene Suzuki, ECF No. 107-3, PageID # 71 (testifying that it is not her practice to read documents before signing them); Royden Suzuki Test., ECF No. 107-3, PageID #s 2958-59 (testifying that he did not read the affidavit he submitted to this court before signing it, instead signing it because Susan Matsuda told him to).

      **B.   Hilo Products' Officers, Directors, and Employees.**

      1.   Henry Suzuki, the founder of Hilo Products, had a stroke in 1977, then passed away. *See* Bartolome Test., ECF No. 107-2, PageID # 2846. Royden Suzuki became the one-third owner of Hilo Products. He was for a time also its president and a director. *See* Royden Suzuki Test., ECF No. 107-3, PageID # 2952 (testifying that he was president of Hilo Products from 2010 through 2020); Matsuda Test., ECF No. 107-3, PageID # 2926 (testifying that Royden Suzuki was a past president of Hilo Products); Royden Suzuki Depo., ECF No. 79-13, PageID # 1658 (testifying that he was formerly the president of Hilo Products and is now retired); Royden Suzuki Depo., ECF No. 78-3, PageID #s 1048 (testifying that he was a one-third owner of Hilo

Products) and 1049 (testifying that he sold his Hilo Products shares).

   2. From 2009 to 2018, Craig Suzuki was a one-third owner, vice-president, and director of Hilo Products. *See* Sanoria Test., ECF No. 107-2, PageID # 2757 (testifying that Craig Suzuki is an owner, officer, and director of Hilo Products); Craig Suzuki Depo., ECF No. 78-1, PageID # 975 (indicating that he became vice president of Hilo Products in 2009); Royden Suzuki Depo., ECF No. 78-3, PageID # 1048 (testifying that Craig Suzuki was a one-third owner of Hilo Products). His role at the company was to keep track of and to check invoices. *See* Craig Suzuki Depo., ECF No. 78-2, PageID #s 975-77. He actually was not even sure how much of the company he owned. *See id.,* PageID # 978. He testified that Susan Matsuda (his sister) and Brandon Bartolome (his stepson) are currently the other two owners. *See id.,* PageID #s 979-79; *see also* Bartolome Test., ECF No. 107-2, PageID # 2851 (testifying that Craig Suzuki and Susan Matsuda are siblings).

   3. From 2009 to 2018, Susan Matsuda was a one-third owner, treasurer, secretary, and director of Hilo Products. Matsuda is in the Hilo Products Accounts Receivable Department and since 2021 has been its chief executive officer. *See* Matsuda Test., ECF No. 107-3, PageID # 2923 (testifying that she was Hilo Products' former secretary and treasurer and is now its chief

executive officer); Sanoria Test., ECF No. 107-2, PageID # 2757 (testifying that Susan Matsuda is an owner, officer, and director of Hilo Products); Matsuda Depo., ECF No. 78-7, PageID # 1431, and ECF No. 79-11, PageID # 1649; Royden Suzuki Depo, ECF No. 78-3, PageID # 1048 (testifying that Susan Matsuda was a one-third owner of Hilo Products); Sanoria Depo., ECF No. 78-6, PageID # 1294.

       4.   Irene Suzuki is the head of operations and human resources at Hilo Products.  She is married to Craig Suzuki.  *See* Irene Suzuki Test., ECF No. 107-3, PageID # 2932 (testifying that she is not an officer or director of Hilo Products and is instead in charge of its Human Resources Department); Craig Suzuki Depo., ECF No. 78-2, PageID # 979 (testifying that he and Irene Suzuki are married); Depo. of Irene Suzuki, ECF No. 78-4, PageID #s 1100, 1103.  Irene Suzuki signs employment verifications on behalf of Hilo Products.  *See* Depo. of Irene Suzuki, ECF No. 78-4, PageID #s 1111-12.  She is Marlene Sanoria's half-sister, *see* Bartolome Test., ECF No. 107-2, PageID # 2851, but not Marlene Sanoria's supervisor, *see* Irene Suzuki Depo., ECF No. 78-4, PageID #s 1142.

       5.   Brandon Bartolome, Hilo Products' former vice-president and director and its current president, director, and one-third owner, is the son of Irene Suzuki and the stepson of Craig Suzuki.  *See* Bartolome Test., ECF No. 107-2, PageID #s

2793 and 2798 (testifying that he was Hilo Products' vice
president and director) and 2797-98 (testifying that he is Hilo
Products' current president); Bartolome Depo., ECF No. 78-5,
PageID # 1165 (indicating that he is a Hilo Products' director);
and 1168 (testifying that he is an owner, but that he does not
know his percentage of ownership); 1169 (testifying that he is
the president); 1170 (testifying that he is the former vice-
president and officer).

6.    From 2009 through 2018, Marlene Sanoria was
in charge of Hilo Products' Accounts Receivable Department. *See*
Sanoria Test., ECF No. 107-2, PageID #s 2734 and 2765 (testifying
that she was in charge of Hilo Products' Accounts Receivable
Department); Matsuda Depo., ECF No. 79-11, PageID # 1649.
Sanoria was largely unsupervised, doing everything on her own.
*See* Matsuda Depo., ECF No. 79-11, PageID # 1649.  However,
Sanoria did report to Susan Matsuda.  *See* Irene Suzuki Depo., ECF
No. 78-4, PageID # 1113.  While not an owner of Hilo Products,
she handled most of the invoices and paperwork for the Target
account.  *See* Craig Suzuki Depo., ECF No. 78-2, PageID # 985;
Sanoria Depo., ECF No. 78-6, PageID # 1301.  Under the
"Functional Responsibility" column in a contact information sheet
Hilo Products entered into Target's online system, Sanoria's job
was described as "Accounts Payable/Receivable," "Financial
Negotiator," and "Business Management."  *See* Ex. P-13; Test. of

10

Rebecca Pruse, ECF No. 107-2, PageID # 2673 (indicating that Ex. P-13 "is a record of the contacts that Hilo would have entered into [Target's] system").

### C. Hilo Products Operates Informally.

1. Royden Suzuki, Hilo Products' past president, owner, and director, could not say whether Hilo Products followed corporate formalities, characterizing the company as "more informal." Royden Suzuki Depo., ECF No. 79-13, PageID # 1658. He said that Hilo Products did not have regular board meetings. *See* Royden Suzuki Depo., ECF No. 78-3, PageID # 1051. Craig Suzuki, Hilo Products' past vice president, owner, and director, similarly testified that Hilo Products does not hold board meetings or observe corporate formalities. *See* Craig Suzuki Test., ECF No. 107-3, PageID # 2874); Craig Suzuki Depo., ECF No. 78-2, PageID #s 980 and 983 (saying that Hilo Products is "relatively informal" with respect to "titles and that kind of thing"). Bartolome, Hilo Products' current president, director, and part-owner, agrees that Hilo Products does not follow corporate formalities. He has not even read its bylaws. *See* Bartolome Test., ECF No. 107-2, PageID #s 2795, 2798, 2833, and 2836. Royden Suzuki similarly said that he was unsure whether he had ever read the bylaws. *See* Royden Suzuki Test., ECF No. 107-3, PageID #s 2952-53.

2. Hilo Products does not hold annual

stockholder meetings.  Any meetings, including board of director meetings, happen over breakfast.  *See* Bartolome Test., ECF No. 107-2, PageID #s 2794-95, 2799; Craig Suzuki Depo., ECF No. 78-2, PageID #s 1015, 1020, 1023-24; Matsuda Depo, ECF No. 79-18, PageID # 1679.

> 3.    Article IV of Hilo Products' bylaws provides:

>> All . . . written contracts and agreements to which the corporation shall be a party . . . shall, unless otherwise directed by the board of directors, or unless otherwise required by law, be signed by any two (2) of the following officers who are different persons: president or vice president, and secretary or treasurer.  The board of directors may, however, authorize any one (1) of such officers to sign any such instruments, for and in behalf of the corporation, without necessity or countersignature; and may designate officers or employees of the corporation, other than those named above, who may, in the name of the corporation, sign such instruments.

Ex. D-1.

> 4.    As noted above, Hilo Products does not have many formal written contracts with customers.  *See* Sanoria Test., ECF No. 107-2, PageID # 2767 (testifying that, prior to working with Target, Hilo Products did not have written contracts with its private commercial customers and only had written contracts with its government customers); Bartolome Test., ECF No. 107-2, PageID # 2852 (same); Matsuda Test., ECF No. 107-3, PageID # 2929; Depo. of Craig Suzuki, ECF No. 78-2, PageID # 1008. Brandon Bartolome did not believe Hilo Products had a written

contract with any of its customers, but admitted that he did not know whether it had a written contract with Target. *See* Bartolome Depo., ECF No. 78-5, PageID #s 1248, 1256.

5. Instead, Hilo Products' invoices took the place of formal contracts. That is, when Hilo Products delivered produce to a customer, it provided the customer with an invoice that was to be paid within 30 days. *See* Bartolome Test., ECF No. 107-2, PageID # 2853; Craig Suzuki Depo., ECF No. 78-2, PageID # 1008; Bartolome Depo., ECF No. 78-5, PageID # 1215; *see also* Bartolome Test., ECF No. 107-2, PageID # 2828 (treating invoices as contracts). Craig Suzuki thought that Hilo Products, in keeping with its usual practice, was delivering produce to Target and providing invoices it expected Target to pay. *See* Craig Suzuki Depo., ECF No. 78-2, PageID # 1008. He was unaware of any formal written contract with Target. *Id.*, PageID #s 1034-35.

6. Royden Suzuki was similarly unaware of any signed agreement with Target. *See* Royden Suzuki Depo., ECF No. 78-3, PageID # 1072. Irene Suzuki, although she signed the employment verifications discussed below, did not realize that the 2009 and 2011 Partners Online agreements were contracts, having not read the agreements. *See* Irene Suzuki Depo., ECF No. 78-4, PageID #s 1126-27. Bartolome testified that he did not realize that Hilo Products had to use Partners Online to do business with Target. *See* Bartolome Depo., ECF No. 78-5, PageID

13

# 1213.  Instead, he thought the business was on an invoice relationship, saying, "You sign, receive product, sign off the invoice, and you pay off the invoice."  *Id.*, PageID #s 1215.

7.    The lack of awareness about the Target agreement did not stem from anyone's attempt to keep anything secret.  Most of Hilo Products' office operations are conducted in a single big room in which everyone can hear everyone else.  *See* Sanoria Test., ECF No. 107-2, PageID # 2756; Craig Suzuki Test., ECF No. 107-3, PageID # 2877; Irene Suzuki Depo., ECF No. 78-4, PageID # 1114; Sanoria Depo., ECF No. 78-6, PageID # 1302 ("It's one big office with a bunch of desks."); Ex P-57 (also filed in the record as ECF No. 79-7, PageID # 1640).  The desks are a few feet apart, so "[y]ou cannot hide things."  Bartolome Depo., ECF No. 78-5, PageID #s 1219; *see also* Batolome Test., ECF No. 107-2, PageID # 2802 (stating that Irene and Craig Suzuki sit three or four feet apart).

## D.    Hilo Products' Relationship with Target.

1.    In 2009, Target approached Hilo Products (through its Oahu produce supplier, Swoish Produce) about whether Hilo Products would supply produce for a Target store on the Big Island.  *See* Bartolome Test., ECF No. 107-2, PageID #s 2809, 2856 (indicating that Chris Swoish, the owner of Swoish Produce on Oahu, introduced Hilo Products to Target); Matsuda Depo., ECF No. 79-11, PageID # 1649; Sanoria Depo., ECF No. 78-6, PageID # 1314-

14

15.  Hilo Products did sell produce to Target, hoping to expand its business.  *See* Sanoria Test., ECF No. 107-2, PageID # 2722; Matsuda Test., ECF No. 107-3, PageID # 2905.  Ultimately, Target became Hilo Products' third biggest customer.  *See* Bartolome Test., ECF No. 107-2, PageID #s 2789-90.

2.  To establish the relationship, Sanoria and Bartolome met with Target representatives, including Tony Ott and Randy Leite.  Leite says that he thought he was meeting with the owners of Hilo Products because of how Sanoria and Bartolome presented themselves and because he knew Hilo Products was a family business.  *See* Test. of Randy Leite, ECF No. 107-2, PageID # 2713; Depo. of Randy Leite, ECF No. 78-9, PageID #s 1491-92.  Leite thought Sanoria was authorized to represent Hilo Products.  In fact, with the exception of consulting Bartolome on a single occasion, Leite says that, in the six years they worked together, he never knew Sanoria to consult anyone about Hilo Products' transactions with Target.  *See* Leite Test., ECF No. 107-2, PageID # 2714.  According to Leite, Sanoria was responsible for anything Target needed from Hilo Products.  *Id.*, PageID # 2715.

3.  Hilo Products had Sanoria do whatever was necessary to get Hilo Products' relationship with Target off the ground.  *See* Matsuda Depo., ECF No. 79-11, PageID # 1651.  Thus, Sanoria signed up for Target's Partners Online website so that Hilo Products could transact business with Target.  *See* Matsuda

15

Depo., ECF No. 79-11, PageID # 1651.  Sanoria considered signing the 2009 and 2011 agreements with Target to fall within her job duties.  *See* Sanoria Test., ECF No. 107-2, PageID #s 2731-33.  In reality, Hilo Products now says Sanoria was not "authorized to sign the contract with Target to get the relationship started."  *See* Matsuda Depo., ECF No. 79-11, PageID # 1651.

4.  Sanoria did not view what she signed in 2009 and 2011 to be formal contracts.  As explained further below, she thought what she was signing was simply a means of accessing the Target Partners Online website so that Hilo Products could be paid.

### E.    Partners Online.

1.  The Partners Online website "is Target Corporation's vehicle to communicate business critical information to our partners."  Exhibit D-2.  The record does not clearly explain what the Partners Online website was in 2009 and 2011.  However, Rebecca Pruse, of Target, explained that, until about 2008, "it was mostly a content repository."  Depo. of Rebecca Pruse, ECF No. 79-19, PageID # 1683.  She said that, at that time, Target did not use it to generate purchase orders and vendors did not use it to send invoices to Target.  *Id.*  Now, Partners Online is a website for Target's vendors.  Pruse says that "it has everything on there that you would ever need to do business with Target.  So any kind of documentation or policies,

tools that you would use to submit data, and reports to, you know, keep track of your business and run your business." Test. of Rebecca Pruse, ECF No. 107-2, PageID # 2653.

2.    According to Pruse, the terms and conditions that vendors must agree to and follow to do business with Target are on the Partners Online website. *See* Pruse Test., ECF No. 107-2, PageID # 2653.  These included the Rules of Use and Confidentiality Agreement, as well as the Conditions of Contract, both of which could be accessed via links on the website.

3.    The Rules of Use and Confidentiality Agreement had to be signed by a vendor before the vendor could access the Partners Online website. *See* Pruse Test., ECF No. 107-2, PageID #s 2655-56.  The 2008 version of the Rules of Use and Confidentiality Agreement explains that Partners Online is a private internet site owned by Target Corporation. *See* Exhibit D-3.  The Partners Online website

> may only be accessed by using an ID and
> password combination issued by Target
> Corporation.  In obtaining an ID and
> password, your company has agreed that it is
> subject to the Rules of Use and
> Confidentiality Agreement and will comply
> with the terms and conditions contained
> herein.

Ex. D-3.

4.    Sanoria first learned of Partners Online in 2009 and thought that it was "about getting payments and setting up the prices."  Sanoria Depo., ECF No. 78-6, PageID #s 1328-29.

17

At the hearing before this court, she reiterated that she thought the Partners Online was a way to get paid. *See* Sanoria Test., ECF No. 107-2, PageID # 2733. With Target's website being called "Partners Online," she thought the "Partners Online agreements" existed just for access to the website through which Hilo Products could get paid. She did not actually read the full agreements or realize that they were formal contracts governing Hilo Products' relationship with Target. Nor did anyone else at Hilo Products hearing about Partners Online realize that it involved a formal contract, not just a Target payment website.

   5. Included in the Conditions of Contract is a choice of law provision (Minnesota). Exhibit D-4. Specifically, paragraph 24, provides:

> The laws of the State of Minnesota, without regard to Minnesota's choice of law principles, govern all matters arising out of or related to the Contract. The parties agree that the exclusive forum and venue for any lawsuit arising out of or related to the Contract shall be the United States District Court for the District of Minnesota.

Although the 2011 Agreement calls for the application of Minnesota law, Target acknowledges that, for the purposes of this motion, there is no difference between Hawaii law and Minnesota law. *See* ECF No. 23, PageID # 289 n.2 ("the law of agency is the same in Hawai'i and Minnesota").

18

### F.    The 2009 Partners Online Agreement.

1.    On April 23, 2009, when Marlene Sanoria, then
the head of Hilo Products' Accounts Receivable Department, signed
Target's Partners Online Agreement, it included the following
language: "I acknowledge receipt of the Target Corporation Rules
of Use and agree to the terms thereof." *See* Ex. D-5B.  The Rules
of Use and Confidentiality Agreement are in evidence as Ex. D-3.

2.    Sanoria testified that nobody at Hilo
Products directed her to sign the 2009 Partners Online Agreement,
and she did not tell anyone that she had signed it, not realizing
that she was signing a formal contract.  *See* Sanoria Depo., ECF
No. 78-6, PageID #s 1331-32.  She says that, had anyone told her
she was signing a contract, she would have had Susan Matsuda read
it.  *See* Sanoria Test., ECF No. 107-2, PageID # 2772.  Nor did
Hilo Products' board of directors designate Sanoria to sign the
agreement under Article IV of Hilo Products' bylaws, which allows
the board to confer express authority to sign. *See* Ex. D-1.

3.    Sanoria explained that she signed the
document "to be able to receive payments through Partners Online
from Target."  Sanoria Depo., ECF No. 78-6, PageID # 1337; *see
also* # 1339 ("I just signed it thinking this is the only way we
would be able to get paid."); and 1356 ("I thought it was just a
means of getting paid."); Sanoria Test., ECF No. 107-2, PageID
# 2772 (explaining that, when she signed the document, she

19

thought it was "a way to receive payment from Target," calling it a "payment portal"). To her, signing fell within her job duties, because accessing the Partners Online website was a way to get paid. *See* Sanoria Depo., ECF No. 78-6, PageID # 1358; and # 1375 ("I was filling out paperwork to get paid."). She did not read the online agreement. *Id.*, PageID # 1363.

4. On its face, the 2009 Partners Online Agreement does not contain a forum selection clause, as it does not specifically incorporate the Conditions of Contract. At most, it states, "I further acknowledge that my Company agrees to abide by the terms set forth on Partners Online in connection with any business my company elects to conduct with Target." *Id*. The Partners Online website has a link to "conditions of contract & rules of use," *see* Exs. D-2 (2009 version) and D-7 (2011 version), but the website does not state on its landing page that a vendor agrees to the Conditions of Contract.

G. **The 2011 Partners Online Agreement.**

1. On October 3, 2011, Sanoria, on behalf of Hilo Products, signed a second Partners Online Agreement. *See* Ex. D-27. She does not believe that she read that online agreement before signing it. *See* Sanoria Test., ECF No. 107-2, PageID # 2733. Again, she thought the 2011 Partners Online Agreement was needed only to access the Partners Online website through which Hilo Products could get paid. *See id.* Not

thinking of it as a formal contract, she thought she had the
authority to sign it.  *See id.*, PageID # 2734.

      2.   Had she bothered to read the 2011 Partners
Online Agreement, Sanoria would have seen the boldfaced and
underlined text on the first page announcing that it was "**<u>a</u>
<u>Legally Binding Agreement</u>**."  Ex. D-27.  It included an
acknowledgment that Hilo Products had reviewed and "agree[d] to
the terms and conditions set forth in the Rules of Use and
Conditions of Contract (including without limitation, the
indemnification, insurance, warranties, governing law, **venue**, and
arbitration provisions contained therein)."  *Id.* (emphasis
added).  It also confirmed that Hilo Products "represents,
warrants, and agrees that . . . The individual signing below is
authorized to sign this agreement on behalf of [Hilo Products]."
*Id.*

      3.   The Conditions of Contract incorporated into
the 2011 Partners Online Agreement was available at that time on
the Partners Online website.  *See* D-7; Pruse Test., ECF No. 107-
2, PageID # 2666.  No login was necessary to view the Conditions
of Contract, as it appeared as a link on the login page.  *See* Ex.
D-6.  Sanoria says that she might have clicked on the link to
read the Conditions of Contract, but she could not specifically
recall whether she did or did not do that.  *See* Sanoria Test.,
ECF No. 107-2, PageID # 2755.

4.    As noted above, included in the Conditions of
Contract, Ex. D-4, is the venue clause at issue in the present
motion.

**H.    Irene Suzuki Verified that Marlene Sanoria Was an
Employee of Hilo Products, Not that She Was
Authorized to Sign the Partners Online Agreements.**

1.    Although she was not an officer or director
of Hilo Products, Irene Suzuki was authorized to sign certain
documents on behalf of Hilo Products, such as accounts and
financial documents.  Irene Suzuki knew which documents she could
sign based on the way the company conducted business.  *See*
Matsuda Depo., ECF No. 78-4, PageID #s 1456-57.  For example,
Irene Suzuki says that, in 2009 and 2011, she had the authority
to sign verifications that individuals were employed by Hilo
Products.  *See* Irene Suzuki Test., ECF No. 107-3, PageID #s 2932-
33.

2.    With respect to the 2009 Partners Online
agreement, Target contacted Irene Suzuki to "verify that the
administrator for your program[, Sanoria,] is a direct employee
of your company, rather than an outside consultant or
manufacturer's representative."  Ex. D-5A.  Irene Suzuki replied
back, saying that she was from Human Resources and that Sanoria
was authorized to access the Partners Online website on behalf of
Hilo Products.  *Id.*  Irene Suzuki thus only confirmed that
Sanoria was an employee and that Hilo Products was allowing

22

Sanoria to use the Partners Online website.  In so stating, Irene
Suzuki did not expressly authorize Sanoria to execute a formal
contract binding Hilo Products.  Nor did Irene Suzuki expressly
agree in the authorization to the Rules of Use discussed above.
In fact, Irene Suzuki testified that the 2009 employment
verification did not even contain the words contract, agreement,
or conditions of contract.  *See* Irene Suzuki Test., ECF No. 107-
3, PageID # 2947.

3.    While Target contends that Irene Suzuki must
be deemed to have signed the 2011 Partners Online Agreement on
behalf of Hilo Products in verifying that Sanoria was
"authorized" to sign the agreement, Irene Suzuki says that she
only signed the employment verification portion of any document.
*See* Irene Suzuki Depo., ECF No. 78-4, PageID #s 1119, 1125, 1128.
This is consistent with the plain language of the document.  *See*
Ex. D-27.  Irene Suzuki signed the document under the heading "**HR
Employment Verification**."  As noted above, her signature was
subject to the following words: "By signing below, the Human
Resources Contact Name verifies that the Authorized Signatory
above is an employee of the Business Partner."  "Authorized
Signatory" is defined in the document as "SANORIA, MARLENE."  *Id.*
The plain language therefore indicates that Irene Suzuki was
verifying that Sanoria was a Hilo Products employee, not stating
that Sanoria was authorized to sign any formal agreement.  Nor

23

was Irene Suzuki herself signing anything other than an
employment verification.  As Irene Suzuki testified, she did not
even think the 2011 Partners Online Agreement was a contract and
was not sure that she ever saw the portion of it stating it was a
legally binding document.  *See* Irene Suzuki Test., ECF No. 107-3,
PageID #s 2941-44.  Nothing before this court demonstrates that
Irene Suzuki thought she was binding Hilo Products to a venue
clause.

I.    **Marlene Sanoria's Authority to Sign Contracts.**

1.    No officer or director told Sanoria that she
was authorized to sign contracts on behalf of Hilo Products.  *See*
Sanoria Test., ECF No. 107-2, PageID # 2770-71.  In fact, most of
them did not think Sanoria had the authority to do so or did not
know one way or the other.

a.    For example, Royden Suzuki testified
that he did not know whether Sanoria had authority to sign
contracts on behalf of Hilo Products from 2009 to 2011.  In fact,
Royden Suzuki did not even know what Sanoria's role was at the
company.  He said his sister, Susan Matsuda, handled all the
paperwork and contracts at that time, even though he, as
president, could sign contracts.  *See* Royden Suzuki Test., ECF
No. 107-3, PageID #s 2953 (stating that he did not know what
Sanoria's responsibilities were at Hilo Products) and 2954
(stating that he did not know whether Sanoria had the authority

24

to sign contracts on behalf of Hilo Products); Royden Suzuki Depo., ECF No. 79-13, PageID #s 1658-59. Royden Suzuki admitted that, even though his declaration states that Marlene Sanoria and Irene Suzuki were not authorized to sign contracts on behalf of Hilo Products, he was not sure whether that assertion was true. He says that his sister, Susan Matsuda, put the declaration in front of him and asked him to sign it and that he did so because he trusted his sister. He also explained that, although he did not read the declaration himself, his attorney went over it with him, reading it to him. *See* Royden Suzuki Depo., ECF No. 79-13, PageID # 166; Royden Suzuki Test., ECF No. 107-3, PageID #s 2957, 2961, 2964.

b.   Craig Suzuki testified that he did not think Marlene Sanoria or Irene Suzuki had the authority to sign a contract with Target, although he did not know for sure. He explained that he thought only his brother (Royden Suzuki) and sister (Susan Matsuda) had that authority. *See* Craig Suzuki Test., ECF No. 107-3, PageID # 2882; Craig Suzuki Depo., ECF No. 78-2, PageID #s 996-97, 1000, 1036.

c.   Susan Matsuda was the most confident Hilo Products witness to testify that Marlene Sanoria was not authorized to sign the contract with Target to get the relationship started. *See* Matsuda Depo., ECF No. 79-11, PageID # 1651. Matsuda stated that neither she nor any other Hilo

25

Products officer told Sanoria that she had such authority. *See*
Matsuda Test., ECF No. 107-3, PageID #s 2913, 2929, 2930.
Although Matsuda also testified that it was within Sanoria's job
duties to agree to the terms of Partners Online so that Hilo
Products could do business with Target, she followed that
testimony immediately with the statement that she did not believe
that signing a contract with Target was part of Sanoria's job
duties and that Sanoria would normally ask Matsuda to sign
things. *See* Matsuda Depo., ECF No. 78-7, PageID # 1439-41.
Matsuda thus appears to have viewed Partners Online as only a
payment vehicle that Sanoria had authority to access.

          d.    Bartolome testified that Matsuda took
care of the office and had the authority to bind Hilo Products.
He said that Royden Suzuki also had such authority when serving
as Hilo Products' president. *See* Bartolome Depo., ECF No. 79-14,
PageID # 1665.  Bartolome did not believe that Sanoria had the
authority to sign a contract with Target. *See* Bartolome Test.,
ECF No. 107-2, PageID #s 2882-83; Bartolome Depo., ECF No. 78-5,
PageID #s 1220 (indicating that only Royden Suzuki, Susan
Matsuda, and Craig Suzuki could sign contracts).  He says he
never told Sanoria that she was authorized to sign a contract
with Target on behalf of Hilo Products. *See* Bartome Test., ECF
No. 107-2, PageID # 2859.

2.    It appears that, had anyone made it clear to
Sanoria that a formal contract had to be signed for Hilo Products
to do business with Target, she would have given any such
contract to Susan Matsuda to read and take care of.  *See* Sanoria
Test., ECF No. 107-2, PageID # 2772.  Because Sanoria did not
read the contractual documents and thought she was dealing with
only a payment portal, she signed things.  Someone at Hilo
Products had to set up the Partners Online account and Bartolome,
who met Target representatives with Sanoria, did not even own a
computer, so could not do it.  *See* Sanoria Test. ECF No. 107-2,
PageID # 2734.

3.    While no officer or director expressly told
Sanoria to do whatever was necessary to do business with Target,
she was accustomed to handling new accounts herself.  *See* Sanoria
Test., ECF No. 107-2, PageID # 2771; Matsuda Test., ECF No. 107-
3, PageID #s 2899, 2906, 2912.  Matsuda said that Sanoria was
indeed tasked with "setting up the [Target] account," which
required getting set up with the Partners Online website.  *Id.*,
PageID #s 2900-01.  Matsuda did not understand what Partners
Online was.  Like Sanoria, Matsuda thought it was simply a
website or platform for payments and related matters.  *See id.*,
PageID #s 2904, 2920.  Matsuda and Craig Suzuki expected Sanoria
to know any terms and conditions relating to Hilo Products'
relationship with Target, but Matsuda never asked Sanoria about

27

any terms and conditions. *Id.*; Craig Suzuki Test., ECF No. 107-3, PageID # 2877. Because Hilo Products did not have formal contracts with private customers, it did not occur to Matsuda that there was a formal contract with Target. *See* Matsuda Test., ECF No. 107-3, PageID # 2929.

4.    Had Sanoria brought Target's documentation to Matsuda, Matsuda might have signed them at the time. *See id.*, PageID # 2907. Knowing what she knows now, however, she would ask Hilo Product's attorney to review any contract with Target. *See* Matsuda Test., ECF No. 107-3, PageID # 2929.

5.    Sanoria faced no discipline for having signed the 2009 and 2011 Partners Online agreements. Depo. of Marlene Sanoria, ECF No. 78-6, PageID # 1418; Answer to Interrogatory #16, ECF No. 78-32, PageID # 1551.

### J.    2018 Electronic Funds Transfer Agreement.

In 2018, Craig Suzuki signed an Electronic Funds Transfer Agreement. Through it, Hilo Products "authorize[d] Target . . . to electronically deposit payments to the bank account designated by Vendor on the Wells Fargo enrollment website." It states, "Payments will be subject to the terms and conditions contained in the commercial agreement between Target and Vendor which governs the goods sold or services performed." *See* ECF No. 79-36, PageID 1794; *see also* Craig Suzuki Test., ECF No, 107-3, PageID #s 2890-92.

II.        CONCLUSIONS OF LAW.

          Target argues that this court should transfer this
action to the District of Minnesota in accordance with the forum
selection clause incorporated into the 2011 Partners Online
Agreement.  ECF No. 7-1, PageID #52-55.  Target does not suggest
that transfer would be appropriate if Hilo Products is not bound
by the forum selection clause.  Hilo Products, for its part, only
argues that the forum selection clause is not binding because
Sanoria did not have the authority to sign the 2011 Partners
Online Agreement on its behalf.  *See* ECF No. 21, PageID # 235-47.
Hilo Products does not contend that, even if it is bound by the
forum selection clause, this case should nevertheless remain in
the District of Hawaii.  Accordingly, to resolve what remains of
this motion, this court need only determine whether Hilo Products
is bound by Sanoria's signature on the 2011 Partners Online
Agreement.

          In its earlier order, this court set forth the legal
standard governing this motion.

          If Hilo Products is not bound by the 2011 agreement at
all, the forum selection clause has no effect.  *See TRM Mfg.,
Inc. v. Home Depot U.S.A., Inc.*, 2017 WL 11636241, at *3 (C.D.
Cal. Feb. 27, 2017).  This court has examined whether Sanoria is
Hilo Products' agent such that her actions bind Hilo Product.
*See Sher v. Cella*, 114 Haw. 263, 267, 160 P.3d 1250, 1254 (Ct.

29

App. 2007) ("traditional agency law states that a principal should be bound by its agent's conduct").  Based on the evidence received, the court issues the following conclusions of law:

> **A.    General Agency Law.**

> 1.    It is well-established that an "act of an agent does not bind his [or her] principal unless done within the scope of his [or her] authority."  *Nahaolelua v. Kaaahu*, 10 Haw. 18, 22 (1895).  Under section 7 of the Restatement (Second) of Agency, "Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him."  The comments to section 7 explain that "authority . . . is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he [or she] is privileged to do because of the principal's manifestations to him."

> 2.    An agent may have actual authority to bind the principal.  *See Nelson v. Boone*, 78 Haw. 76, 82, 890 P.2d 313, 319 (1995).  Actual authority may be expressed or implied from the conduct of the parties or surrounding circumstances.  *See Cho Mark Oriental Food, Ltd. v. K & K* Int'l, 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992).  An agent may also bind a principal when the agent has apparent authority.  *See id.* at 516, 836 P.2d at 1062.  Finally, a principal may also be bound by the

ratification of an initially unauthorized act of an agent.  *See Caplan v. Hoffschlaeger*, 2 Haw. 691, 697 (1863).  Target claims that Hilo Products is bound by Sanoria's signature on the 2011 agreement under each of these agency theories.[1]  ECF No. 23, PageID # 289-94.

### B.    Express Actual Authority.

1.    "Express actual authority requires an oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain acts."  *Cho Mark Oriental Food*, 73 Haw. at 515-16, 836 P.2d at 1062.  "Actual authority exists only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent to so act[.]"  *Nelson*, 78 Haw. at 82, 890 P.2d at 319; *see also* Restatement (Third) of Agency § 2.01 ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.").

---

[1] In its initial motion, Target did not argue that Sanoria had express actual authority. *See* ECF No. 7.  However, after conducting discovery, Target has done so in supplemental briefs. Given the extensive briefing on the matter and the lack of prejudice to Hilo Products (its Opposition to the original motion argued lack of actual authority, ECF No. 8, PageID #s 240-41), the court examines Target's actual authority argument, rather than potentially forcing it to file another motion that reargues matters that have been fully briefed.

2.   Target argues that Sanoria had express actual
authority to bind Hilo Products to the terms and conditions of
the 2009 and 2011 Partners Online agreements because it was
within Sanoria's job duties to agree to the terms of Partners
Online so that Hilo Products could do business with Target. *See*
Sanoria Test., ECF No. 107-3, PageID #s 2731-33; Depo. of Susan
Matsuda, ECF No. 78-7, PageID # 1439.  The court disagrees.

3.   Sanoria credibly testified that she did not
read the agreements and thought she was only signing material
allowing Hilo Products to access the Partners Online website so
that Hilo Products could get paid.  She did not think she was
signing a binding contract. *See* Sanoria Test., ECF No. 107-3,
PageID # 2733; Sanoria Depo., ECF No. 78-6, PageID #s 1328-29,
1332, 1337, 1339, 1356, 1363.  The name, "Partners Online," does
suggest a website, rather than a contract with Target.
Additionally, with the exception of its government clients, Hilo
Products did not have formal written contracts with its clients.
Neither Sanoria nor anyone else at Hilo Products realized that
Sanoria was signing or had signed a formal contract with Target.
*See* Sanoria Test., ECF No. 107-2, PageID # 2767; Bartolome Test.,
ECF No. 107-2, PageID # 2852; Matsuda Test., ECF No. 107-3,
PageID# 2929; Craig Suzuki Depo., ECF No. 78-2, PageID # 1008.
The credible testimony establishes that Hilo Products gave
Sanoria the authority to fill out the necessary forms to access

Target's website so that Hilo Products could get paid, not the authority to sign formal contracts governing Hilo Products' relationship with Target.

4.    Sanoria did not have express authority to sign contracts binding Hilo Products.  Article IV of Hilo Products' bylaws required contracts to be signed by designated Hilo Products' officers or by someone authorized by its board of directors to do so.  *See* Ex. D-1.  Sanoria was part of the Hilo Products Accounts Receivable Department, not an officer, director, or owner of Hilo Products.  *See* Sanoria Test., ECF No. 107-2, PageID #s 2734 and 2765.  The record does not establish that Hilo Products' board of directors expressly authorized Sanoria to sign any contract.  In fact, had Sanoria realized that she was signing was a formal contract, she would have passed it on to Matsuda to handle.  *See* Sanoria Test., ECF No. 107-2, PageID # 2772; Sanoria Depo., ECF No. 78-6, PageID # 1331-32; Matsuda Test., ECF No. 107-3, PageID #s 2913, 2929-30; Matsuda Depo., ECF No. 79-11, PageID # 1651.

5.    Under these circumstances, Target fails to establish that Sanoria had express actual authority to sign the Partners Online agreements on behalf of Hilo Products.

## C.    Implied Actual Authority.

1.    Implied actual authority "may arise either independent of any express grant of authority or it may arise as a necessary or reasonable implication required to effectuate some other authority expressly conferred by the principal." *Cho Mark Oriental Food*, 73 Haw. at 516, 836 P.2d at 1062 (quotation marks and citation omitted).  An agent's authority may be "implied from the conduct of the parties or surrounding circumstances." *Nelson*, 78 Haw. at 82, 890 P.2d at 319.  With respect to implied actual authority, "the focus is on the agent's understanding of his [or her] authority inasmuch as the relevant inquiry is whether the agent reasonably believes, because of the conduct of the principal (including acquiescence) communicated directly or indirectly to him [or her], that the principal desired him [or her] so to act." *Id.*; *see also* Restatement (Third) of Agency § 2.02(1) ("An agent has actual authority to take action designated or implied in the principal's manifestations to the agent and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act.") and cmt. c ("Actual authority is an agent's power to affect the principal's legal relations in accord with the agent's reasonable understanding, at the time the agent acts, of the principal's manifestations to the agent.").

2.    The Restatement explains that, for an agent
to have implied actual authority, the agent must reasonably
believe he or she has such authority:

> An agent does not have actual authority to do
> an act if the agent does not reasonably
> believe that the principal has consented to
> its commission.  Whether an agent's belief is
> reasonable is determined from the viewpoint
> of a reasonable person in the agent's
> situation under all of the circumstances of
> which the agent has notice.  Lack of actual
> authority is established by showing either
> that the agent did not believe, or could not
> reasonably have believed, that the
> principal's grant of actual authority
> encompassed the act in question.  This
> standard requires that the agent's belief be
> reasonable, an objective standard, and that
> the agent actually hold the belief, a
> subjective standard.

Restatement (Third) of Agency § 2.02 cmt. e.

3.    Citing *Exceptional Urgent Care Ctr. I, Inc.
v. Protomed Med. Mgmt. Corp.*, 2009 WL 2151181, at *6 (M.D. Fla.
July 13, 2009), Target argues that Sanoria had implied actual
authority to bind Hilo Products because it was "necessary, usual,
and proper" for her to sign the contract to do business with
Target.  *See* ECF No. 106, PageID # 2632 .  *Exceptional Urgent
Care* stated that an "agent's actual authority is grounded in the
principal's manifestations (however indirect) to the agent, not
the principal's unexpressed will, mental state, or unknown
wishes.  A party that authorizes an agent to perform an act may
impliedly authorize the agent to enter into a click agreement on

its behalf as part of the performance of the authorized act.  The
key inquiry is whether [the agent's] consent to the [online
contract] was 'necessary, usual, and proper to accomplish or
perform' her responsibilities . . . .").  Target's argument based
on *Exceptional Urgent Care* is unpersuasive.

> 4.    As noted above in this court's discussion of
express actual authority, Hilo Products' usual practice was to
conduct business without formal contracts.  Instead, its clients
placed orders, which Hilo Products filled, thereafter providing
invoices that were to be paid.  Given this usual practice,
Sanoria's failure to read the Partners' Online agreements, and
Sanoria's belief that she was authorized to sign up for what she
thought was only an online payment portal, this court concludes
that Sanoria lacked implied actual authority to execute the
Partners Online agreements on behalf of Hilo Products.  In so
concluding, this court stresses that it is certainly not stating
that any party may evade contractual obligations by just failing
to read a contract.  That is not the law at all.  Instead, this
court is ruling that Target has not established that implied
actual authority applies here.

### D.    Apparent Authority.

> 1.    "Apparent authority is the power held by an
agent or other actor to affect a principal's legal relations with
third parties when a third party reasonably believes the actor

has authority to act on behalf of the principal and that belief
is traceable to the principal's manifestations."  Restatement
(Third) Of Agency § 2.03 (2006).  Apparent authority arises "when
the principal does something or permits the agent to do something
which reasonably leads another to believe that the agent had the
authority he was purported to have."  *Cho Mark Oriental Food*, 73
Haw. at 516, 836 P.2d at 1062 (quotation marks and citation
omitted).  "The critical focus is not on the principal and
agent's intention to enter into an agency relationship, but on
whether a third party relies on the principal's conduct based on
a reasonable belief in the existence of such a relationship."
*Id.* at 516-17, 836 P.2d at 1062.

>    2.    That articulation of the rule "is meant for a
case where the principal is a human being rather than a
corporation." *Chase v. Consol. Foods Corp.*, 744 F.2d 566, 568
(7th Cir. 1984) (Posner, J.).  In the corporate context, it is
more difficult to identify "the principal" who can confer
apparent authority on an agent.  *See id.*  Of course, a
corporation can only act through its agents.  *Id.*  Thus, in the
corporate context, apparent authority arises when one corporate
agent does something that creates the appearance that another
corporate agent had the authority at issue.  *See id.*

>    3.    Apparent authority "must be created by agents
other than the agent whose authority is in question."  *Id.*  In

other words, an agent "cannot just bootstrap himself into a position where he can bind his principal." *Id.*; *see also Upper Valley Aviation v. Mercantile Nat. Bank*, 656 S.W.2d 952, 957 (Tex. App. 1983) ("[T]he authorized acts or words of an agent, other than the agent claiming the benefit of apparent authority, must be considered.").

        4.    The agent who creates the appearance of authority must also be "responsible." *Chase*, 744 F.2d at 569. For example, a Hilo Products janitor could not have created the impression that Sanoria had the power to bind Hilo Products.  To show that Target *reasonably* concluded that Sanoria had the authority to bind Hilo Products, Target must show that the person it relied on could be expected to know whether or not Sanoria had that authority.  Target makes the required showing.

        5.    Hilo Products held Sanoria out as its representative.  In 2009, when Target was in initial discussions with Hilo Products, Tony Ott and Randy Leite (of Target) met with Bartolome (Hilo Products' vice-president and director) and Sanoria.  Hilo Products later described Sanoria's job to Target as "Accounts Payable/Receivable," "Financial Negotiator," and "Business Management."  *See* Ex. P-13; Pruse Test., ECF No. 107-2, PageID # 2673 (indicating that Ex. P-13 "is a record of the contacts that Hilo would have entered into [Target's] system").  Leite says that he thought he was meeting with the owners of Hilo

38

Products because of the way Sanoria and Bartolome presented themselves, and he knew Hilo Products was a family business. *See* Matsuda Depo., ECF No. 79-11, PageID # 1649; Sanoria Depo., ECF No. 78-6, PageID # 1314; Leite Test., ECF No. 107-2, PageID # 2713; Leite Depo., ECF No. 78-9, PageID #s 1491-92. Leite says that he always had the impression that Sanoria had the authority to represent Hilo Products. In fact, Sanoria signed the 2011 Partners Online Agreement, representing that she was authorized to sign it on behalf of Hilo Partners. *See* Ex. D-27.

6.    Consistent with that representation, except for a single occasion, Sanoria did not consult anyone with respect to doing business with Target. *See* Leite Test., ECF No. 107-2, PageID # 2714. Leite says that, during that period, Sanoria was responsible for everything Target needed in terms of Target's relationship with Hilo Products. *Id.*, PageID # 2715.

7.    Hilo Products accepted the benefits of the 2009 Partners Online Agreement signed by Sanoria for about two years before Sanoria signed the 2011 agreement. That acceptance supports the reasonableness of Target's belief that Sanoria was authorized to bind Hilo Products. *See* Matsuda Depo., ECF No. 78-7, PageID #s 1464-65 (conceding that Target paid Hilo Products millions of dollars over the course of their relationship and that Matsuda, as an owner of the company, accepted the financial benefits of that relationship).

39

8.    Accordingly, it was reasonable for Target to
conclude that, in dealing with Sanoria, it was dealing with a
Hilo Products representative who was authorized to bind her
company.  Target had before it the conduct of Hilo Products
officers and of Sanoria, Hilo Products' description of Sanoria's
job as including being a financial negotiator and business
manager, Hilo Products' acquiescence in Sanoria's representation
of Hilo Products in every aspect of the relationship, and Hilo
Products' receipt of payments under the agreement.

9.    In concluding that Sanoria had apparent
authority, this court is not relying on the proposition that,
when Irene Suzuki signed the Partners Online agreements, she was
indicating that Sanoria was authorized to bind Hilo Products.
This court views Irene Suzuki as having merely signed a
verification that Sanoria was a Hilo Products employee.  *See* Ex.
D-27.

### E.    Ratification.

1.    "The unauthorized act of an agent, if
ratified, is as binding upon the principal as an original express
grant of authority."  *Hawaii Hous. Auth. v. Uyehara*, 77 Hawaii
144, 150, 883 P.2d 65, 71 (1994) (internal quotation marks and
brackets omitted).  Ratification can occur through "conduct that
justified a reasonable assumption that the [principal]" has
assented to the initial act.  Restatement (Third) Of Agency

40

§ 4.01 (2006).  For instance, "knowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction." *Id.*, cmt. d.

  2. Usually, a principal must know the "material facts involved in the original act" to ratify it.  Restatement (Third) Of Agency § 4.06 (2006).  A principal, however, may "choose to ratify [an act] without knowing material facts."  *Id.*, cmt. d.  "A factfinder may conclude that a principal has made such a choice when the principal is shown to have had knowledge of facts that would have led a reasonable person to investigate further, but the principal ratified without further investigation."  *Id.*

  3. There is no evidence that Hilo Products executives expressly ratified either the 2009 or the 2011 Partners Online Agreement.

  4. Target argues that Hilo Products ratified the 2011 agreement by selling produce to Target for seven years.  ECF No. 23, PageID # 293.  However, at best, the record demonstrates that Hilo Products' officers thought their dealings with Target were being conducted in the usual manner.  That is, before working with Target, Hilo Products did not have formal written contracts with its private clients, including Safeway and KTA Super Stores.  Instead, Hilo Products generally treated invoices as individual transaction contracts.  This meant that, when Hilo

41

Products delivered produce, it provided its customers with an invoice that was to be paid within 30 days.

5.    Hilo Products' officers credibly testified that they did not think there was a formal written contract with Target.  While many officers worked in one large office and could hear Sanoria mentioning Partners Online, *see* ECF No. 107-2, PageID #s 2757-58, nothing in the record establishes that any officer knew that what Sanoria had signed was more than a document allowing Hilo Products to be paid by Target.  The evidence is insufficient to show that Hilo Products ratified the 2011 Partners Online Agreement.

6.    Target also argues that Hilo Products ratified the 2011 Partners Online Agreement in 2018, when Craig Suzuki signed an Electronic Funds Transfer Agreement.  *See* Ex. D-77.  Through this 2018 agreement, Hilo Products "authorize[d] Target . . . to electronically deposit payments to the bank account designated by [Hilo Products] on the Wells Fargo enrollment website."  *Id.*  The 2018 agreement also states, "Payments will be subject to the terms and conditions contained in the commercial agreement between Target and Vendor which governs the goods sold or services performed."  *Id.*  This generic reference to a "commercial agreement" in a form authorizing electronic deposits into Hilo Products' bank account would not "have led a reasonable person to investigate further" as to

42

whether Hilo Products already had some formal written contract with Target.  *See* Restatement (Third) Of Agency § 4.06 (2006).

       7.   Craig Suzuki did not know about any written contracts with Target.  *See* Craig Suzuki Depo., ECF No. 78-2, PageID # 1008, 1034-35.  He testified that he did not read the "commercial agreement" clause.  Craig Suzuki Test., ECF No. 107-3, PageID # 2892.  Even if he had, the Electronic Funds Transfer Agreement was a means to get paid electronically and refers only to a "commercial agreement," rather than specifically identifying any agreement with a venue provision.  Craig Suzuki therefore did not investigate "the terms and conditions contained in the commercial agreement" before signing the Electronic Funds Transfer Agreement.  Under these circumstances, Target does not show that Hilo Products ratified the 2011 Partners Online Agreement when Craig Suzuki signed the Electronic Funds Transfer Agreement.

**III.     CONCLUSION.**

      Because Hilo Products has demonstrated that Marlene Sanoria had apparent authority to sign the 2011 Partners Online Agreement, Hilo Products is bound by the terms of that agreement, including the venue provision in the Conditions of Contract that was incorporated into it.  Accordingly, this action will be transferred to the United States District Court for the District of Minnesota.

It is so ordered.

DATED: Honolulu, Hawaii, January 30, 2023.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*Hilo Products, Inc. v. Target Incorporated*, Civ. No. 22-00069 SOM/WRP; ORDER GRANTING
TARGET CORPORATION'S MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(A)